(Reap. Dec. 10451)

W. J. BYRNES & COMPANY v. UNITED STATES

Entry No. 6520, etc.

(Decided February 13, 1963)

*Stein & Shostak* (*S. Richard Shostak* and *Marjorie M. Shostak* of counsel) for the plaintiff.

*John W. Douglas*, Acting Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

DONLON, Judge: The merchandise at issue is fishhooks, exported from England, which were entered at Seattle at various times between March 3, 1958, and December 17, 1959. Four suits for reappraisement of the merchandise have been consolidated for purposes of trial.

There is no serious controversy as to facts. Proofs of record include the official papers; a stipulation which was entered into on trial; the affidavit (introduced by plaintiff) of one David J. Sealey, identified as the sales director in Redditch, England, of Edgar Sealey & Sons, Ltd., manufacturer of the merchandise, which affidavit was verified on February 16, 1962, before the United States vice consul at Birmingham, England (exhibit 1) ; and a report (certified copy introduced by defendant) of Treasury Agent James O. Holmes to the Commissioner of Customs, which report is dated April 24, 1959 (exhibit A).

It appears that during the period of these importations there were two pricelists offering the Sealey regular stock fishhooks for export to the United States. One of these lists quoted sterling prices; the other list quoted dollar prices. It is conceded that the sterling and dollar list prices were adjusted approximately to equivalency by the respective discounts that were quoted in the two pricelists.

There were also pricelists, with prices likewise quoted in sterling and in dollars, for certain special fishhooks that Sealey manufactured to specification for two of its United States customers; but since the special fishhooks are not involved in this litigation, there is no need to consider the pricelists for the special merchandise.

The proofs of record show that, except in Western United States, sales of the stock fishhooks to American customers were made to wholesalers and manufacturers at list prices adjusted by the quoted discounts. In the West, there was a different sales arrangement. There, Sealey had two commission merchants, with exclusive territories as follows: John B. Merifield Co., whose territory included the States of Washington, Oregon, Idaho, Montana, Utah, Colorado, Nevada, and Wyoming, and also northern California; and Bradlow,

Inc., whose territory was southern California. Sales to Merifield and Bradlow were made by Sealey at the same prices at which sales were made to wholesalers and manufacturers elsewhere in the United States.

The circumstance that gives rise to this litigation is that Sealey, notwithstanding its exclusive territory arrangement with Merifield and Bradlow, continued, with their knowledge and evident assent, to sell its regular fishhooks directly to a few old customers in their territories. Such sales were made at list prices, but without adjustment for the quoted discounts. On these sales, a discount, less in amount than the discounts quoted in the pricelists, was paid to Merifield or Bradlow, according to the territory in which Sealey made the direct sale to the old customer.

There is no question that these fishhooks are not merchandise enumerated in the final list (T.D. 54521) issued by the Secretary of the Treasury, pursuant to the Customs Simplification Act of 1956 (T.D. 54165). Therefore, since all of the merchandise with which these appeals are concerned was entered subsequent to February 27, 1958, it is to be appraised under the amended law at export value, provided there is an export value for the merchandise.

It appears that there is an export value. Appraisal was on the basis of export value, and that is the basis for which plaintiff contends. There is no issue, therefore, as to basis of appraisement.

The appraiser valued these fishhooks at the list prices, as charged to the so-called old customers, and without any reduction for discount, either the discount quoted in the catalog or the special discount paid to the exclusive agents for the territories in which these old customers were located. It is plaintiff's claim that list prices, less the discount regularly offered and allowed to wholesalers, manufacturers, and exclusive agents, are the proper export values of the merchandise under the provisions of the new law applicable to these entries. Defendant claims that the higher prices charged to the old customers are the proper values for the merchandise.

Plaintiff makes alternative claims for valuation on the basis of either sterling or dollar prices. The appraisement was made in dollars. While, if decision should be for plaintiff on its principal claim, namely, for appraisement at list prices adjusted by list discounts, it probably would make very little practical difference in which currency such decision might be expressed, a conclusion that plaintiff's proposed findings appear to concede, nevertheless, the alternative claims cannot be wholly ignored.

Appraisement at export value should be in the currency in which merchandise is offered for export. *United States* v. *Tiffany & Co.*, 10 Ct. Cust. Appls. 247; *D. N. & E. Walter & Co.* v. *United States*, 24 Cust. Ct. 206, C.D. 1233. Here, England is the country from which the fishhooks were exported. The merchandise was offered in Eng-

land for export to the United States both at sterling and at dollar prices. Since there were offerings at dollar prices, the appraiser clearly was permitted to value in dollars. He will not be required to value in sterling.

As to what the dollar value should be, the record shows that, between October 1, 1957, and March 1, 1959, 39 percent in value of sales to United States customers were of stock fishhooks and 61 percent were of the hooks specially made to customer specifications. As earlier noted, the special hooks are not in issue. Our consideration is limited to the stock fishhooks, appraisement of which is challenged.

There is no issue as to usual wholesale quantity.

Reducing the sales figures of record to percentiles of sales of the stock fishhooks, it appears that 77 percent of such hooks were sold at list prices (including both sterling and dollar prices) adjusted by the quoted list discounts, and that 23 percent were sold to the so-called old customers at list prices, without discount adjustment to the buyer, but with a commission of 10 percent on each such sale paid to the exclusive agent for the territory.

Defendant's case rests chiefly on the argument that plaintiff has not shown a price at which the merchandise was offered, in usual wholesale quantity, to *all* purchasers for export to the United States; that this is a fact which plaintiff is required to prove, citing *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740; and that plaintiff has, therefore, failed to meet its burden of proof and has not overcome the presumption that the appraised values are the true values of the merchandise.

Before applying the facts of record to the law, let us first consider what the law was *at the time this merchandise was entered*, and whether the principle of the *Glanson* case is applicable.

We are here concerned with section 402, as amended by the Customs Simplification Act of 1956. The *Glanson* case construed old section 402, as it was prior to the 1956 amendment, and as it is now for valuation of merchandise on the final list. Defendant's brief does not assist the court in considering the applicability of the *Glanson* decision under the amended law, but merely asserts its relevance. Nonetheless, and without benefit of the assistance of counsel, the court has the onus of determining whether that decision, handed down under old section 402 and construing its language, is equally applicable to the different language of new section 402, under which this merchandise is to be valued.

I find that the *Glanson* decision is not controlling here, both in view of the language of new section 402 and the intention of Congress in enacting the new law. If there is one thing evident about what Congress intended in the new section 402, it is that Congress wanted

to get away from a too narrow construction of the old valuation formulae as that construction had been judicially developed over the years.

It is well to keep in mind precisely what Congress enacted in the new law, by way of definition of export value, and what the old law definition is.

New section 402(b) is as follows:

For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise *is freely sold or, in the absence of sales, offered for sale* in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States. [Sublineation supplied.]

Old section 402(d) is as follows:

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale *to all purchasers* in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. [Sublineation supplied.]

Relevant to our consideration also is the provision of new section 402(f), as follows:

For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Two changes are of importance to consideration of export value under the new law.

First, actual sales, if the merchandise is freely sold, are the sole measure of export value. If there are no actual "free" sales, and only in that event, then offerings for sale are the measure of export value under the new law. See section 402(b).

In determining whether goods are freely sold or, in the absence of sales, are offered for sale, the meaning Congress intended is specifically stated in section 402(f)(1). Proofs include either sales to all purchasers at wholesale, *or* "in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise \* \* \*."

There is not a single set of prices at which sales of the regular stock fishhooks were made to all purchasers at wholesale. There were the special prices to old customers, at which 23 percent of sales were made. There were all other sales, 77 percent, at the freely offered catalog prices. Thus, the situation calls for a decision between different prices, since there was not a single price to all purchasers. The criteria for choice were specified by Congress. Which sales were in the ordinary course of trade? Which prices "fairly reflect[s] the market value of the merchandise"?

It is shown that the old customers were, in a special circumstance, limited to their own customer relation from past dealings. We may not infer, in the light of the record, that the sales to them were the sales in the ordinary course of trade, and that sales generally to all other customers were not in the ordinary course of business.

And which of the prices fairly reflect market value? Decisions construing the new language are not yet numerous. But our late esteemed colleague, Judge Mollison, a learned judge, construed this very provision in *Acme Steel Company* v. *United States*, 48 Cust. Ct. 497, Reap. Dec. 10135. (Application for review pending.) The following excerpt from his opinion is relevant here:

> * * * it must be remembered that the price sought in connection with section 402(f)(1)(B) is *not* necessarily that which reflects the *fair market value* of the merchandise, but is that "which *fairly reflects* the market value of the merchandise." [Italics added.] The two phrases do not necessarily mean the same thing. [Italics quoted.]
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> It seems to me that the key term in section 402(f)(1)(B) is "market value." See *United States* v. *Alfred Kohlberg*, 2 Cust. Ct. 849, Reap. Dec. 4526, affirmed in *Same* v. *Same*, 27 C.C.P.A. (Customs) 223, C.A.D. 88. In that case, the third division of this court said (p. 852):
>
>> Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade. See *United States* v. *Sixteen Cases of Silk Ribbons*, 27 Fed. Cases 1099 * * *. [Pp. 501, 502.]

The great majority of sales of these fishhooks at wholesale were made at list prices, less quoted discounts. Those prices and terms were freely offered. They fairly reflect market value. A minority of sales were made to old customers under special terms, and they do not fairly reflect market value.

The court, in the *Glanson* case, *supra*, construed "to all purchasers" to mean that, absent a uniform price to all purchasers, value was to be fixed by a price at which all purchasers could purchase, which obviously was the price to the least-favored purchaser, ergo, the highest price. The court had no opportunity to consider what would be the effect of a statutory provision, such as we now have, that requires the appraiser to consider a situation where there are different

prices, and, in that event, to select the price to purchasers at wholesale "which fairly reflects the market value of the merchandise * * *." We have no need, under the new law to arbitrarily create a price to all customers, when that is contrary to the fact. This is a change which the new law has effected.

I, therefore, make the following findings of fact and conclusions of law.

I find as facts:

1. That the merchandise of these appeals to reappraisement consists of regular stock fishhooks, exported from England by Edgar Sealey & Sons, Ltd., between March 3, 1958, and December 17, 1959.

2. That fishhooks are not specified in the final list of articles published by the Secretary of the Treasury pursuant to the Customs Simplification Act of 1956, effective on and after February 27, 1958.

3. That, at the time of exportation, the regular stock fishhooks of these appeals were sold for export to the United States at different prices, but such price differences were not based on differences in quantities.

4. That, at the respective times of exportation, the regular stock fishhooks of these appeals were freely sold in England, without restrictions, for export to the United States, in the ordinary course of trade, to exclusive agents in assigned territories in the western part of the United States, and to wholesalers and manufacturers elsewhere in the United States, all of whom bought for industrial use or for resale otherwise than at retail, at list prices, in sterling or in dollars, adjusted by discounts quoted in said lists.

5. That, at the respective times of exportation, the regular stock fishhooks of these appeals were also sold in England, without restrictions, for export to the United States to a few old customers of Edgar Sealey & Sons, Ltd., in the territories of the exclusive agents in western United States; that said old customers bought such fishhooks for industrial use or for resale otherwise than at retail, at list prices, in dollars, but without adjustment for the discounts quoted in the list; that, on all such sales, a discount of 10 percent was paid by Sealey to the exclusive agent for such territory.

6. That, at the respective times of exportation, the regular stock fishhooks of these appeals were freely sold or offered for sale at different prices to one or more selected purchasers at wholesale.

7. That, at the respective times of exportation, the list prices adjusted by quoted discounts were the freely offered prices at which the seller was willing to sell the regular stock fishhooks of these appeals, and which buyers at wholesale were willing to pay in the ordinary course of trade.

8. That, during the period of these exportations, 77 percent of all regular stock fishhooks sold by Edgar Sealey & Sons, Ltd., for export

to the United States were sold at list prices, sterling or dollar, adjusted by the discounts quoted in the lists.

I conclude as a matter of law:

1. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of the regular stock fishhooks of these appeals.

2. That export value in dollars, on the basis of dollar sales in England for export to the United States, is proper.

3. That, under section 402, as amended by the Customs Simplification Act of 1956, the test of export value, where as here there is not a uniform price to all purchasers at wholesale, is that price, in the ordinary course of trade, which fairly reflects the market value of the merchandise.

4. That the list prices adjusted by quoted discounts fairly reflect the market value of the regular stock fishhooks of these appeals at the time of exportation.

5. That the export values of the regular stock fishhooks of these appeals for reappraisement are the invoice unit values, less 15 percent, plus packing, as to merchandise for which packing charges were invoiced as an extra charge.

Judgment will enter accordingly.